**STATE of Tennessee, Appellee,**

v.

**Tony Lorenzo BOBO, Appellant.**

Supreme Court of Tennessee,
at Jackson.

March 9, 1987.

Rehearing Denied April 13, 1987.

Harold D. Archibald, Clim Madlock, Jr., Memphis, for appellant.

W.J. Michael Cody, Atty. Gen. & Reporter, Ann Lacy Johns, Asst. Atty. Gen., Nashville, for appellee.

Susan Kay, Vanderbilt Legal Clinic, Nashville, amicus curiae, for Tenn. Ass'n of Criminal Defense Lawyers.

## OPINION

DROWOTA, Justice.

This is a direct appeal of a death penalty case. Defendant, Tony Lorenzo Bobo, was convicted of first degree murder in the perpetration of robbery and sentenced to death upon the jury's finding of three aggravating circumstances: Defendant was previously convicted of felonies involving the use or threat of violence to the person, the murder was committed while Defendant was engaged in committing robbery, and mass murder. T.C.A. §§ 39–2–203(i)(2), (i)(7), and (i)(12).[1]

The victim, Carolyn Doyle, lived alone at 3419 Kimbell in Memphis. She had been a widow for five years and worked as an office clerk. She did not have an automobile and rode the bus to and from work. On January 6, 1983, Earl Floyd, who lived four doors down the street from Mrs. Doyle, went out to get his newspaper at 6:25 a.m., and found her lying face down in his yard. The police arrived within a few minutes after Mr. Floyd called them. The victim had a faint pulse at that time, but she subsequently died of a single gunshot wound that entered her left back and passed through the chest, tearing both lungs, the heart and the aorta.

At trial, Joe Dean Felix testified that he had met Defendant at the house of a relative, Mack Moss, where Defendant and others were shooting dice and doing drugs. On several occasions Mr. Felix drove his car with Defendant and the two Bridgeforth brothers, Alonzo and Emanuel, as passengers while they looked for victims to rob. Before daybreak one morning in January they saw a heavy-set woman crossing the street. Mr. Felix made two left turns, parked in the next block and one of the Bridgeforth boys and Defendant, armed with a revolver, got out of the car and ran in the direction in which they had seen the woman crossing the street. Mr. Felix heard one or two shots fired and Defendant and Bridgeforth returned to the car with a tote sack. He testified that Defendant said, "Let's get out of here—somebody better catch the news because I killed that bitch." The bag contained thirteen dollars, a jar of Tang, and other miscellaneous items.

Defendant gave a tape recorded statement to Memphis police officers on February 14, 1983, in which he admitted robbing and shooting a heavy-set woman at a bus stop on Kimbell, at about 6:00 a.m., on January 6, 1983. He also stated that Alonzo and Emanuel Bridgeforth and he were riding around together in Mr. Felix's car when they saw the victim; he and Emanuel got out of the car and went back around the corner to rob her. Defendant stuck a cocked pistol in her back but when she tried to resist the gun discharged accidentally.

### I.

### THE GUILT ISSUES

■ Defendant insists that his confession to the murder of Carolyn Doyle should have been suppressed because it was not freely and voluntarily given.

The Memphis Police Department had information implicating Defendant in a number of armed robberies and murders. Upon learning that Defendant was being held in jail at Marion, Arkansas, Sergeant Harvey and another Memphis Police Officer were sent to interrogate him. On February 8, 11, and 14, 1983, eleven separate statements were taken at the Arkansas jail

---

1. T.C.A. § 39–2–203(i)(12) provides:
 The defendant committed "mass murder" which is defined as the murder of three or more persons within the State of Tennessee within a period of forty-eight (48) months, and perpetrated in a similar fashion in a common scheme or plan.

concerning eleven or more separate crimes. On February 19 and March 2, 1983, nine additional statements were taken at the Criminal Justice Center in Memphis.

Defendant contends that on all of these occasions he was undergoing severe drug withdrawal symptoms, that he had an unattended gunshot wound to the head, that he was not allowed to communicate with his family, and that his many requests for counsel were ignored. The officers involved denied that he displayed any signs of drug withdrawal and stated that Defendant had a superficial crease wound about which he never complained. The officers also testified that Defendant never asked for counsel and that he had been advised of his *Miranda* rights, after which he freely executed written waivers on each occasion. The statements were recorded and transcribed and the tapes were played back to Defendant; he acknowledged the accuracy of the statements in each instance.

After a full pre-trial hearing, the trial judge held that all of the statements were freely and voluntarily given and were admissible at trial. Nevertheless, appropriately, the only statement introduced at the guilt phase of the trial was Defendant's confession to the murder of Mrs. Doyle.[2] The trial judge made express findings of fact, all contrary to Defendant's contentions. Those findings have the weight of a jury verdict and we find material evidence to support the trial judge's findings; we are, therefore, required to affirm. *See State v. O'Guinn*, 709 S.W.2d 561, 565–566 (Tenn.1986).

■ Defendant insists that the trial judge should have granted his motion for a change of venue based upon the publicity of Defendant's trial for the murder of George Huffman, Jr., which occurred approximately two and one-half months prior to the Doyle murder trial. In support of that issue, Defendant claims that the trial judge did not consider the factors listed in

*State v. Hoover*, 594 S.W.2d 743, 746 (Tenn. Crim.App.1979).

The Huffman murder trial was reported in *The Memphis Commercial Appeal* from December 4 through 12, 1984. The articles can be fairly described as routine factual reporting of a murder trial. The trial judge allowed individual voir dire of the jurors, no doubt in recognition of the short interval between the two trials. The voir dire indicates that, of the jurors selected who had any knowledge of the publicity about the Huffman murder trial, all testified that they could decide the case entirely on the evidence presented in this case without reference to any prior publicity. The matter of a change of venue addresses itself to the sound judicial discretion of the trial judge; his decision will be respected absent an affirmative and clear abuse of that discretion. *Rippy v. State*, 550 S.W.2d 636 (Tenn.1977).

■ Defendant complains that the trial judge refused to grant his challenge for cause of juror Brenda Endress. Ms. Endress was examined individually on the second day of jury selection, February 19, 1985. The prospective jurors had not been sequestered at that point and that morning she had read an article in *The Memphis Commercial Appeal* reporting that Defendant's second trial was underway. Although most of the article dealt with Defendant's pre-trial motions, it mentioned that Defendant had been convicted in December of the murder of George Huffman, Jr., and given a life sentence after the jury had dead-locked eleven to one in favor of sending him to the electric chair. Ms. Endress was carefully examined by defense counsel and by the court; her examination concluded as follows:

> THE COURT: All right. Can you set anything aside that you have read or seen or heard and make your decision solely on what you hear and see from that witness stand and base it on the law to the tape.

2. The tape recording was played to the jury, who had copies of the transcript while listening

that I give you at the end of this trial? Can you do that?

JUROR ENDRESS: I feel like that I am knowledgeable enough to do that.

There was no error in rejecting Defendant's challenge of this juror for cause.

■ Defendant asserts that the State's challenges for cause of prospective jurors Morris Brooks and Ella Fields were erroneously granted by the trial judge. Although some of Mr. Brooks's responses to defense counsel's questions were ambiguous, his responses taken as a whole reveal that he was opposed to the death penalty on religious and other grounds and would not impose it under any circumstances. Among his objections to capital punishment, Mr. Brooks believed that "[m]ost of the folks that are on death row and that get the death penalty just happen to be black and I am strongly opposed to that."

■ With respect to Ella Fields, she repeatedly made it clear that her opposition to the death penalty was so strong that to avoid facing the punishment issue she probably could not vote for conviction, regardless of the proof. The trial court correctly excused jurors Brooks and Fields for cause. *See Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 84 (1985).

■ Defendant says that the trial court excluded jurors from service on the jury who were opposed to the death penalty on religious grounds, amounting to a religious test for jury service in violation of Article I, § 6, Tennessee Constitution. Defendant fails to single out any particular juror in asserting this issue. We have read the voir dire carefully and, while some jurors said their opposition to and inability to impose the death penalty, regardless of the evidence adduced, was based in whole or in part on religious grounds, those jurors were excused because their views on capital punishment rendered them unable to follow the law as given to them by the court and to perform their duties as jurors in accord with their oaths. That their views on capital punishment may have had

a religious foundation does not necessarily transform the tests mandated by the United States Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Wainwright v. Witt, supra*, into religious tests for the purposes of the Tennessee Constitution. This issue has no merit.

■ Defendant raises the "conviction-prone" or "death qualified" jury issue, adopted by an Arkansas Federal District Judge in *Grigsby v. Mabry*, 569 F.Supp. 1273 (1983), and affirmed by the Eighth Circuit Court of Appeals at 758 F.2d 226 (1985). The decisions in *Grigsby* were based on social science studies labelled "Conviction-Prone-ness Surveys". We have rejected those studies and their rationale of unconstitutional jury rejection in *State v. McKay*, 680 S.W.2d 447 (Tenn. 1984), and in numerous subsequent cases.

This issue has now been settled by the United States Supreme Court in *Lockhart v. McCree*, —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), in which the social science studies were found to be seriously flawed. The United States Supreme Court found that prospective jurors excludable under *Witherspoon* were not distinctive groups for fair cross section purposes. The death qualification of the jury resulted in an impartial jury that would apply the law and find the facts according to their oath.

■ Defendant argues that the trial judge erred in admitting certain photographs into evidence. During the guilt phase of the trial, a photograph of Mrs. Doyle and, subsequently, at the sentencing phase, photographs of two other murder victims were admitted. While these photographs had little probative value, all were head shots and contained nothing prejudicial to Defendant. This issue has no merit.

■ Defendant says that the trial judge erred in admitting the testimony of Joe Dean Felix regarding two attempted rob-

beries that immediately preceded the robbery and murder of Mrs. Doyle. Mr. Felix testified that they were cruising around looking for victims to rob and that, after spotting a prospect at a supermarket, Defendant, armed with a revolver and accompanied by one of the Bridgeforth brothers, left the car but they soon returned and reported that the victim had eluded them. Later they followed a woman in a car to her home and parked around the corner; Defendant left the car but quickly returned, stating: "I missed that bitch, but I am going to get the next one." The robbery and murder of Mrs. Doyle occurred approximately one hour later according to Mr. Felix. In Defendant's statement admitted into evidence he insisted that the shooting of Mrs. Doyle was accidental. These two attempts at similar crimes, which immediately preceded the one for which Defendant was on trial, and Defendant's statement that he was going to get the next one were relevant to the issue of whether the killing was accidental or intentional. *See, e.g., Bunch v. State,* 605 S.W.2d 227 (Tenn.1980).

■■■ Defendant insists that the State's proof was insufficient to justify a rational trier of fact in finding guilt beyond a reasonable doubt. The confession of Defendant and the testimony of Joe Dean Felix were more than sufficient to permit any rational trier of fact to find Defendant guilty of the murder of Mrs. Doyle beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Rule 13(e), T.R.A.P.

Defendant insists that the Tennessee Death Penalty Act is unconstitutional for a number of reasons, all of which we have fully considered and rejected in prior opinions of this Court.

## II.

### THE SENTENCING ISSUES

At the sentencing hearing, the owner of the Country Inn Lounge testified that on Friday night, December 10, 1982, at about 10:00 p.m., in response to a woman (Mrs. Willet)'s cry for help, he and a friend found Mr. Willet lying on the pavement behind his lounge with a bullet wound in his chest. He called the ambulance and the police. His friend, Mr. Morrison, testified that he kept pressure on Mr. Willet's chest to try to stop the bleeding while awaiting the ambulance. Mrs. Willet told him that her husband had been shot by a black male. Both of these witnesses identified pictures of Kenneth Willet as the man shot in the chest on that occasion.

Officer Hopkins testified that he was called to the Country Inn Lounge on the night of December 10, 1982, and was told by Mrs. Willet that her husband was shot by a black male who fled south on Getwell. The ambulance had already left with the victim when the officer arrived. Officer Hopkins then testified that on the night of January 28, 1983, he and his partner answered a shooting call at the Bel Air Apartments and upon arrival found a man identified as George Huffman lying face down between two of the apartment units; Mr. Huffman was seriously wounded and his hysterical wife was nearby. Tyrone Key, Mr. Huffman's stepson, testified about the incident. He was with his mother when a man came out of the alley, grabbed his mother, put a gun to her head and said he would kill her; his stepfather approached and said, "Oh, no, that's my wife." The two men started wrestling and his stepfather was shot. He identified Defendant as the man who shot his stepfather.

The medical examiner testified that he performed an autopsy on Kenneth Willet and George Huffman. Mr. Willet died from a gunshot wound to the left side of his chest; the shot was fired from a distance of two feet or less. Mr. Huffman died from a gunshot wound to the abdomen.

Sergeant Harvey testified that Defendant lived across the street from the Bel Air Apartments where Mr. Huffman was killed. He learned that a day or two after

Mr. Huffman was killed, Defendant tried to sell a .38 caliber Rossi revolver, the type of weapon that killed Mr. Huffman. He began looking for Defendant and learned that he was in jail in Marion, Arkansas. Subsequently, a number of statements were taken and on February 11, 1983, Defendant confessed to the Willet murder. The tapes and transcripts of these two statements were introduced into evidence.

In addition, Defendant and his mother testified. His mother stated that she was seventeen years old when Defendant was born. When he was five or six years old, his father was killed by the police in Chicago; his father was in the syndicate and was bringing a shipment of guns from Mississippi to Chicago when he was killed. She said Defendant first got into trouble at age fourteen.

Defendant testified that he began using drugs at age fourteen; he had never had a job and had supported his drug habit by stealing and robbing. He said that he started on alcohol and marijuana and later used heroin, cocaine, T's and Blue's, PCP and "stuff." Further, while he was incarcerated in Pikeville, his girlfriend died giving birth to his child. He testified that when he got out of prison after serving fourteen months for assault with intent to commit a felony, he did not have a drug problem. He admitted that he killed Mr. Willet just seventeen days after getting out of prison.

A clinical psychologist testified that Defendant had an anti-social personality disorder and was of the opinion that, with appropriate care in a highly structured environment, Defendant could be rehabilitated. The psychologist also admitted that Defendant was still dangerous and capable of killing if he were left in an unstructured environment.

 Regarding the sentencing phase of his trial, Defendant attacks the constitutionality of the mass murder aggravating circumstance. He contends that the statute is void for vagueness because the defi-

nition of mass murder leaves unclear whether a conviction, an indictment or neither is required to show the commission of the requisite murders, and unless the statute requires convictions for the previous offenses of murder, the results of its application would be absurd, oppressive and bizarre. This subsection of T.C.A. § 39–2–203 does leave the word "murder" undefined; however, T.C.A. § 39–2–201, defines "murder" as follows:

> "Murder generally.—If any person of sound memory and discretion, unlawfully kill [sic] any reasonable creature in being, and under the peace of the state, with malice aforethought, either express or implied, such person shall be guilty of murder."

The Legislature clearly intended to incorporate the definition of murder found in T.C.A. § 39–2–201 into T.C.A. § 39–2–203(i)(12); this definition is sufficient to prevent any invalidating vagueness in this regard. This does not, however, completely resolve the issue raised by Defendant concerning the application of this aggravating circumstance.

T.C.A. § 39–2–203(i)(12) is unique to Tennessee; no other State has provided for an aggravating circumstance involving "mass" or "serial" murder in its death penalty statute. This case is the first in which this Court has been faced with construing this section of the Tennessee death penalty statute. The Legislature adopted this amendment to the statute in 1981. The legislative history reveals that the Legislature was concerned with the kinds of serial murders committed by Wayne Williams in Atlanta or by the "Son of Sam" in New York. The Legislature intended serial or mass murders perpetrated over an extended but definite period and committed in a similar fashion as part of a pattern to be an aggravating circumstance to justify imposition of the death penalty. As the Defendant has noted, T.C.A. § 39–2–203(i)(12) does not expressly require that the State show that a defendant has been convicted of (much less indicted for) the

murders "of three or more persons within the State of Tennessee within a period of forty-eight (48) months [committed] in a similar fashion in a common scheme or plan." The language of this subsection may readily be interpreted *not* to require that the State show a defendant has been convicted of these murders, but it may also be construed to require a showing of three or more convictions of murder. Consequently, the provision is ambiguous.

Ordinarily, when faced with a question of statutory construction, the words of a statute are taken in their natural and ordinary sense without a forced construction to limit or extend their meaning. *State v. Hinsley*, 627 S.W.2d 351, 354 (Tenn.1982). Our primary obligation " 'is to give effect to the statutory purpose. When the proper application of a statute is not entirely clear, the first inquiry is to ascertain the general legislative intent.' *State by Lockert v. Knott*, 631 S.W.2d 124, 126 (Tenn.1982)." *Neff v. Cherokee Insurance Co.*, 704 S.W.2d 1, 2 (Tenn.1986). Penal statutes, however, must be construed strictly against the State. *See State v. Goins*, 705 S.W.2d 648, 651 (Tenn.1986). In this case, we are confronted with two reasonable constructions of the statute. One interpretation would require the State to prove the triggering offenses for application of the mass murder aggravating circumstance by showing the defendant had been convicted of at least three murders; the other would permit the State to show that these murders had been committed by any competent evidence at the sentencing stage of the trial, whether or not these offenses had been reduced to convictions at the time of the sentencing proceeding. We have examined the legislative history and have not found any clear indicia of Legislative intent on this issue.[3]

If the State is not required to prove that the defendant has been convicted of the triggering murders, then the death penalty

sentencing proceeding, which is generally held before the same jury that has just convicted the defendant of first degree murder, would in effect become the forum in which the defendant would be tried for the triggering offenses. Although our cases require that at least one applicable aggravating circumstance to justify the imposition of the death penalty be proven beyond a reasonable doubt, *see, e.g., State v. Moore*, 614 S.W.2d 348, 351–352 (Tenn. 1981), and *Cozzolino v. State*, 584 S.W.2d 765, 768 (Tenn.1979), to permit the State to present evidence sufficient to convince the jury beyond a reasonable doubt that the defendant had committed murders, for which he has not yet been convicted and before the very jury that has just returned a guilty verdict for first degree murder, violates the concept of fundamental fairness embodied in due process of law, subjecting a defendant to what is in effect a trial without the panoply of substantive and procedural protections afforded by the Tennessee Constitution. Such a procedure would thus be invalid under the law of the land provision of this State's Constitution, Article I, § 8, which "is synonymous with the 'due process' clause of the Fifth and Fourteenth Amendments to the Constitution of the United States. *Daugherty v. State*, 216 Tenn. 666, 393 S.W.2d 739 (1965)." *Dearborne v. State*, 575 S.W.2d 259, 262 (Tenn.1978). *See also Frazier v. State*, 480 S.W.2d 551, 552 (Tenn.Cr.App.), *cert. denied* (Tenn.1972).

Not only would the defendant not be tried before an impartial jury, to which he has an independent fundamental right, *see, e.g., State v. Davis*, 637 S.W.2d 471, 472 (Tenn.Cr.App.1982), and without the prerequisite presentation or indictment required by the State Constitution, *Spurgeon v. Worley*, 169 Tenn. 697, 703, 90 S.W.2d 948, 950 (1936), but to permit the State to present evidence of other murders for which the defendant has not been convicted under T.C.A. § 39–2–203(i)(12) would cir-

---

**3.** *See* Legislative Journal, 1981 Tenn. Public Acts, Ch. 33, § 1; Senate Debate, March 2, 1981, Senator Koella, Senate Bill 137 (Senate Tape 34), and House Debate, March 9, 1981, Representative Lashlee, House Bill 660 (House Tape 40), 92nd General Assembly.

cumvent and defeat the requirements for showing of the existence of another aggravating circumstance, T.C.A. § 39-2-203(i)(2) (the defendant was previously *convicted* of other felonies involving violence or threats of violence). In *State v. Adkins,* 653 S.W.2d 708 (Tenn.1983), we found that the trial court committed error when it permitted the State to introduce evidence at the sentencing phase that the defendant had been indicted but not yet convicted of an aggravated assault charge. 653 S.W.2d at 715. Admission of evidence of a murder for which a defendant had not yet been convicted would clearly be more prejudicial than that of a lesser offense involving violence or a threat of violence as was the case in *State v. Adkins, supra.* Thus, if only convictions may qualify as an aggravating circumstance under T.C.A. § 39-2-203(i)(2), but something less than convictions could be used for the purposes of T.C.A. § 39-2-203(i)(12), the limitation imposed by the language of T.C.A. § 39-2-203(i)(2) would become meaningless insofar as evidence of multiple murders other than the one for which a defendant has just been convicted would be involved. Such a construction of the death penalty statute would be contextually inconsistent as well as unconstitutional. "The statute should be given a construction that will not render its terms useless." *State v. Netto,* 486 S.W.2d 725, 729 (Tenn.1972). The provisions of a statute covering the same subject will be construed *in pari materia. Gallagher v. Butler,* 214 Tenn. 129, 137, 378 S.W.2d 161, 164 (1964).

As regards the admissibility of convictions, Tennessee cases provide additional guidance for the application of T.C.A. § 39-2-203(i)(12). For the convictions to be admissible under the subsection at issue or under T.C.A. § 39-2-203(i)(2), "the date of the conviction, not the commission of the crime, is the important factor. The order in which the crimes were actually committed is irrelevant as long as the convictions have been entered before the sentencing hearing at which they are introduced into evidence." *State v. Caldwell,* 671 S.W.2d

459, 465 (Tenn.1984), *cert. denied,* 469 U.S. 873, 105 S.Ct. 231, 83 L.Ed.2d 160 (1984).

Although no other State includes as an aggravating circumstance a provision covering "mass" or "serial" murder in its death penalty statute, several states have confronted the issue of whether the showing of other murders than the one for which the defendant has been convicted requires previous convictions. In *State v. McCormick,* 272 Ind. 272, 397 N.E.2d 276 (1979), the Indiana Supreme Court invalidated as unconstitutionally applied a provision of the Indiana death penalty statute under which evidence of unrelated murders for which no convictions had been obtained was admissible, recognizing the anomaly that "the sentencing hearing in the present case would amount to nothing short of a full trial on the aggravating circumstance issue." 397 N.E.2d at 279. That Court determined that a conviction must be shown under Ind.Code § 35-50-2-9(b)(8), despite the fact that the language clearly permitted evidence other than that of a conviction to be presented, because any other interpretation of the statute would risk imposition of the death penalty in an arbitrary and capricious manner. 397 N.E.2d at 281. As the Indiana Supreme Court observed:

"We may assume that a conviction was obtained in a constitutionally proper manner. Proof of a conviction therefore carries with it the assurance that the facts underlying that conviction have already been fully established to an untainted, unbiased jury in a forum in which the full protections of the Constitution were afforded to the defendant."

397 N.E.2d at 281. Any other construction would violate due process of law. *Id.*

Recognizing that apparent constitutional defects in a statute can be remedied by a restrictive application of the statutory language, the Washington Supreme Court dealt with a comparable issue as that presented here in *State v. Bartholomew,* 98 Wash.2d 173, 654 P.2d 1170 (1982) (*en banc*).

"The [United States Supreme] Court has made clear ... that if the legislature fails to provide sufficient guidance in defining aggravating circumstances, then the state's supreme court in reviewing the death sentence must supply the omission, with an acceptably narrow interpretation. The validity of the aggravating circumstances therefore will depend upon this court's maintaining a clear and narrow interpretation of the aggravating circumstances to provide the sentencing authority with the constitutionally necessary guidance."

654 P.2d at 1180. The Washington Supreme Court reasoned that a danger of improper prejudice to the defendant arose when the State sought to present evidence of unrelated crimes for which no convictions had yet been obtained against defendant and that such a procedure violated due process guarantees.

"To allow the jury which has convicted defendant of aggravated first degree murder to consider evidence of other crimes of which defendant has not been convicted is, in our opinion, unreasonably prejudicial to defendant.... In effect, to allow such evidence is to impose upon a defendant who stands in peril of his life the burden of defending, before the jury that has already convicted him, new charges of criminal activity. Information relating to defendant's criminal past should therefore be limited to his record of convictions."

654 P.2d at 1184. Such a record carries with it the presumption that the convictions were obtained with the defendant's constitutional guarantees fully afforded. *Id.*

The Court of Appeals of Maryland was presented with a related issue in *Scott v. State,* 297 Md. 235, 465 A.2d 1126 (1983). That Court was faced with construing the State's death penalty statute to avoid a similar problem as that involved in this case. There, the Court concluded that where two sections of the statute conflicted, one permitting evidence of other crimes for which the defendant had not been con-

victed to be admitted and the other requiring convictions, to allow evidence of crimes that had not been reduced to convictions would render both sections meaningless. 465 A.2d at 1133. The Court read the death penalty statute as a whole to avoid the unreasonable result in which, on the one hand a mitigating circumstance to be considered under Maryland's statute was the lack of previous convictions, but on the other hand, the State could present evidence of other crimes for which no convictions had been obtained. Such evidence would expose the jury to inflammatory details concerning crimes for which the defendant had never been tried. 465 A.2d at 1136.

◼ We are of the opinion that while the language of T.C.A. § 39–2–203(i)(12) could be read to permit the State to present evidence of murders other than the defendant's record of convictions to show this aggravating circumstance beyond a reasonable doubt, such a construction would violate a number of State Constitutional guarantees, including the rights to a trial by an impartial jury, to an indictment or presentation, to confront witnesses against him, and against self-incrimination, all guaranteed by Article I, § 9, of the Tennessee Constitution. Essentially, therefore, such a construction would result in a procedure so unfair and prejudicial as to violate the due process of law guaranteed by Article I, § 8, "[t]hat no man shall be taken or imprisoned, or deseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." *See, e.g., State ex rel. Anglin v. Mitchell,* 596 S.W.2d 779, 786 (Tenn.1980); *Van Zandt v. State,* 218 Tenn. 187, 198, 402 S.W.2d 130, 135 (1966). As this Court stated almost a century ago:

"It is well to observe in the outset that all intendments are in favor of the constitutionality of an act of the legislature, passed with the forms and ceremonies requisite to give it the force of law; and

that where one construction will make a statute void on account of conflict with the Constitution, and another would render it valid, the latter will be adopted by the courts, even though the former, at first view, be otherwise the more natural interpretation of the language used. Every reasonable doubt must be solved in favor of the legislative action."

*Cole Manufacturing Co. v. Falls,* 90 Tenn. 466, 469, 16 S.W. 1045, 1046 (1891). *See also, e.g., State ex rel. Maner v. Leech,* 588 S.W.2d 534, 540 (Tenn.1979); *Dennis v. Sears, Roebuck and Co.,* 223 Tenn. 415, 420, 446 S.W.2d 260, 263 (1969); *City of Chattanooga v. Harris,* 223 Tenn. 51, 61, 442 S.W.2d 602, 606 (1969); *Ellenburg v. State,* 215 Tenn. 153, 157, 384 S.W.2d 29, 31 (1964); *Bayless v. Knox County,* 199 Tenn. 268, 275–276, 286 S.W.2d 579, 583 (1955).

■ In this case, in accordance with the established rule of statutory construction, we have concluded that T.C.A. § 39–2–203(i)(12) may be constitutionally applied if the triggering offenses are shown only by convictions that have been entered prior to the sentencing hearing at which they are to be utilized to establish this aggravating circumstance. "We will not declare a statute unconstitutional when we are reasonably able to do otherwise—to preserve its meaning and purpose through a constitutionally correct construction. *See Williams v. Cothron,* 199 Tenn. 618, 288 S.W.2d 698 (1956)." *Mitchell v. Mitchell,* 594 S.W.2d 699, 702 (Tenn.1980). This interpretation not only avoids any constitutional defects but it harmonizes any potential conflict with T.C.A. § 39–2–203(i)(2), which clearly requires prior convictions to be shown, and also achieves the purpose for which the provision was enacted. "For, as stated in *Peay v. Nolan,* 'It is not the

form of a statute or the words that are used, but the object intended and the result reasonably effected by their use that must control this determination [of a statute's constitutionality].' 157 Tenn. 222, 235, 7 S.W.2d 815, 818." *Ashe v. Leech,* 653 S.W.2d 398, 402 (Tenn.1983).

■ The jury found three aggravating circumstances existed to justify the imposition of the death penalty in this case. The mass murder provision was not properly applied to Defendant because he did not have a sufficient number of triggering convictions for the murders "of three or more persons within the State of Tennessee within a period of forty-eight (48) months, and perpetrated in a similar fashion in a common scheme or plan."[4] The two remaining aggravating circumstances were proven beyond a reasonable doubt and fully support the jury's sentence of death. The Defendant's conviction for the murder of George Huffman was admissible under T.C.A. § 39–2–203(i)(2). *See State v. Caldwell, supra,* 671 S.W.2d at 465. Nevertheless, evidence of a murder for which Defendant had not yet been convicted was admitted and was error under our decision in this case as well as in *State v. Adkins, supra,* and *State v. Buck,* 670 S.W.2d 600, 606 (Tenn.1984), raising the issue of whether a remand for resentencing is required due to the insufficiency of the evidence to support the jury's finding of one of the aggravating circumstances. To resolve this issue, we must determine whether this was harmless or prejudicial error.

■ An error is harmless or prejudicial depending on the extent to which the proof in the record exceeds the standard necessary to sustain a jury decision, that is, proof beyond a reasonable doubt. *See, e.g., State v. Carter,* 714 S.W.2d 241, 248 (Tenn.

---

**4.** We observe parenthetically that a showing that a defendant has been convicted of three or more murders within the four year period prescribed is not of itself sufficient to trigger the application of this provision; the statute explicitly requires that these murders be perpetrated in a similar fashion as well as part of a common

scheme or plan. Otherwise, murder convictions would have to be shown under T.C.A. § 39–2–203(i)(2) to qualify as an aggravating circumstance within the meaning of the death penalty statute. The three triggering murders, however, may include the one for which the defendant has just been convicted.

1986); *Delk v. State,* 590 S.W.2d 435, 442 (Tenn.1979). Thus, the more convincing the evidence, the less prejudicial the error. We have been previously presented with similar situations in which the jury found several aggravating circumstances to justify the imposition of the death penalty, but, on review, one of these aggravating circumstances was found to be insufficiently supported or improperly applied. *See, e.g., State v. Sheffield,* 676 S.W.2d 542 (Tenn. 1984); *State v. Buck, supra; State v. Workman,* 667 S.W.2d 44 (Tenn.1984); *State v. Cone,* 665 S.W.2d 87 (Tenn.1984); *State v. Campbell,* 664 S.W.2d 281 (Tenn. 1984); *State v. Adkins, supra; State v. Moore, supra.* Each case turns on the determination of whether the error was harmless or prejudicial beyond a reasonable doubt. *See* Rule 36, T.R.A.P.

The evidence of guilt is substantial and clearly supports the verdict of first degree murder beyond a reasonable doubt. In its sentencing decision, the jury found three aggravating circumstances, one of which was not applicable; however, the other two aggravating circumstances, T.C.A. §§ 39–2–203(i)(2) and (i)(7), clearly apply and "[t]he State, of course, is required to show only one aggravating circumstance beyond a reasonable doubt in order to justify imposition of the death penalty." *State v. Moore, supra,* 614 S.W.2d at 351–352. *See also State v. Campbell, supra,* 664 S.W.2d at 283; *State v. Workman, supra,* 667 S.W.2d at 47, *Cozzolino v. State, supra,* 584 S.W.2d at 768. The evidence admitted regarding the murder of Kenneth Willet, for which Defendant had not been convicted, did not consist of inflammatory details; it primarily demonstrated that Defendant perpetrated all three murders as part of a pattern of armed robberies in which he killed his victims. *Cf. State v. Sheffield, supra,* 676 S.W.2d at 553 (Inflammatory details of crimes for which no conviction existed were so prejudicial as to require resentencing); *State v. Buck, supra,* 670 S.W.2d at 606 (Combined with other errors, admission of evidence of a crime for which no conviction existed was prejudicial error).

In *State v. Campbell, supra,* evidence of convictions that did not involve the use or threat of violence was improperly admitted to show the existence of T.C.A. § 39–2–203(i)(2), but the jury also found that two other aggravating circumstances did justify the imposition of the death penalty, and thus we concluded that in light of the admissible evidence and the lack of mitigating circumstances, the error was harmless beyond a reasonable doubt. 664 S.W.2d at 284. As we stated in *State v. Workman, supra,* 667 S.W.2d at 49,

"[t]he validity of the death penalty would not be affected in view of the overwhelming evidence of defendant's guilt and the numerous other aggravating circumstances found by the jury, which are admittedly supported by the requisite evidence, and the paucity of evidence of mitigating circumstances."

In this case, we have found no other errors than the admission of evidence of a crime for which Defendant had not been convicted; this evidence consisted of circumstances similar to those involved in the two murders for which Defendant had been convicted. Given that the two other aggravating circumstances are fully supported by the record and that little evidence of any mitigating circumstances exists, as in *State v. Cone, supra,* in view of the nature and circumstances of this murder and considering Defendant's admissible record, "[a]fter careful consideration we are of the opinion that if any error was committed by the jury, it was harmless beyond a reasonable doubt in view of multiple aggravating circumstances which are clearly established." 665 S.W.2d at 94.

We have carefully considered each of the other issues presented on appeal and found them to be without merit. As interpreted, T.C.A. § 39–2–203(i)(12) may be constitutionally applied, although it could not be applied to the Defendant in this case. For this section to apply, the State must show beyond a reasonable doubt (1) that the defendant had been *convicted* of three or more murders, including the one for which

he has just been tried, (2) within the State of Tennessee, (3) within a period of forty-eight (48) months, (4) perpetrated in a similar fashion, and (5) in a common scheme or plan.

■ Pursuant to T.C.A. § 39–2–205, we have reviewed the sentence of death in this case and are of the opinion that it was neither excessive nor disproportionate to the penalty imposed in similar cases. The conviction of murder in the first degree and the sentence of death are affirmed. The sentence of death will be carried out on the 17th day of June, 1987, unless stayed by appropriate authority. Costs are adjudged against the Defendant.

HARBISON and COOPER, JJ., concur.

BROCK, C.J., and FONES, J., dissent.

FONES, Justice, dissenting.

I agree that the mass murder aggravating circumstance is unconstitutional because it does not require the State to prove that defendant has been convicted of two or more other murders prior to the sentencing hearing.

I disagree that the mass murder aggravating circumstance can be rescued from unconstitutional infirmity, under the guise of preserving its meaning and purpose, "through a constitutionally correct construction."

The only other aggravating circumstance that allows proof of other crimes not committed in connection with the commission of the murder on trial is the second aggravating circumstance that requires *conviction* of one or more felonies involving the use or threat of violence. The Legislature obviously made a conscious choice in omitting the requirement of conviction in enacting the mass murder aggravating circumstance.

Thus, in my view, we are not preserving the meaning and purpose of the legislative enactment, but are substantially altering its meaning and purpose as written and as clearly intended. That view is supported by the inescapable fact that, as rewritten by this Court, the mass murder aggravating circumstance is completely redundant because every murder conviction that could be proven would fully support aggravating circumstance number two and in some instances would fully support the death penalty under aggravating circumstance number seven. The result is that the Court strains legislative intent to the breaking point, rewrites a statute to conform to its view of legislative intent, but nothing of substance that was not already included in the aggravating circumstances theretofore enacted, has been added. I would declare the mass murder aggravating circumstance unconstitutional, period.

In my opinion a new sentencing hearing is required, whether the mass murder aggravating circumstance is constitutional or unconstitutional. The use of the mass murder aggravating circumstance enabled the State to present evidence to the jury at the sentencing hearing that convincingly proved defendant had murdered Kenneth Willet, in the presence of Mrs. Willet, and in the course of committing another armed robbery, even though defendant had not been convicted of that murder. The Willet murder enabled the prosecution to label defendant a *mass murderer*, with the imprimatur of the Tennessee Legislature. I find it impossible to say that was harmless error beyond a reasonable doubt, in spite of my recognition that it is probable that the jury would have imposed the death penalty if they had never heard of Kenneth Willet or the mass murder aggravating circumstance.

I am authorized to state that Chief Justice BROCK concurs in this dissenting opinion.